UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

MAISOON RENICK, personal representative
of the Estate of SELENA PEREZ,

      Plaintiff,      Case Number 23-12113

v.             Honorable David M. Lawson

DEARBORN HEIGHTS SCHOOL DISTRICT
#7, AARON MOLLETT, and DR. TYRONE
WEEKS,

      Defendants.

_____/

**OPINION AND ORDER GRANTING DEFENDANTS' MOTION FOR JUDGMENT ON
THE PLEADINGS, DENYING AS MOOT PLAINTIFF'S MOTION TO DISMISS
CERTAIN STATE LAW CLAIMS, AND DISMISSING CASE**

   Selena Perez, a student at Annapolis High School in Dearborn Heights, Michigan, tragically took her own life in the spring of 2021 while alone at home. Her mother, plaintiff Maisoon Renick, filed the present action alleging that the defendant school district, its superintendent, and the high school principal bear responsibility for the death because they allowed Selena to go home after school when she was distraught. The defendants have filed a motion for judgment on the pleadings alleging that the complaint fails to state a claim under federal law because there are no pleaded facts that conceivably could invoke a state created danger theory of recovery, and the individual defendants are entitled to qualified immunity. The Court agrees that the complaint fails to state viable federal claims. The Court will dismiss those claims and decline to exercise supplemental jurisdiction over the state law claims. A pending discovery motion also will be dismissed as moot.

I.

Because the defendant's motion challenges the sufficiency of the complaint, the following facts are taken from that pleading.

Plaintiff Maisoon Renick is the personal representative of the estate of Selena Perez, her daughter, who died by suicide on May 1, 2023.  Compl. ¶ 16.  At the time of her death, Selena was a student at Annapolis High School in the Dearborn Heights School District No. 7, where defendant Aaron Mollett was principal and defendant Tyrone Weeks was the district superintendent.  *Id.* ¶¶ 13-15.  The plaintiff alleges that Mollett had been involved in Selena's education since middle school and was aware of her academic, social, and personal history, including physical signs of self-harm on her extremities.  *Id.* ¶¶ 17-18.  He communicated with Selena via email using her school-issued tablet.  *Id.* ¶ 20.  According to the plaintiff, Selena had succeeded academically until the final months of her life, when her grades began to decline, and she began to use marijuana during school hours.  *Id.* ¶¶ 20-21.  School policies required that Selena be suspended for ten days for her marijuana use, but Mollett allegedly routinely failed to enforce the policy to maintain his popularity among students.  *Id.* ¶ 31.

The plaintiff avers that on the day Selena died, Mollett was aware that she was under the influence of marijuana at school but did not report this to her parents.  Instead, he contacted plaintiff Renick to report that Selena had been "tossing bottles" in class.  *Id.* ¶¶ 21-22.  He then permitted Selena to leave school premises at the end of the day without medical treatment or reporting her actions to any other authority.  *Id.*  ¶ 23.  Selena died by suicide later that afternoon at her home.  *Id.* ¶ 24.  Approximately 30 minutes after her death, Mollett and Weeks arrived at Selena's residence to offer their condolences and inform Renick about Selena's earlier marijuana use.  *Id.* ¶ 25.  Renick reports that she did not tell school officials of Selena's death and is unsure

how they learned of her passing. *Id.* ¶¶ 26-27. The School District also confiscated Selena's school-issued tablet. *Id.* ¶ 34. According to the plaintiff, Mollett was later placed on a leave of absence, returned to active duty, and then placed back on leave. *Id.* ¶ 29. Weeks also was placed on leave after three school unions issued "no confidence" resolutions in his performance. *Ibid.*

In her brief responding to the motion for judgment on the pleadings, the plaintiff asserts that two days before her death, Selena emailed Mollett that she had been abused by her stepfather and felt unsafe in her home, but in response to her request for help Mollett did not contact the authorities to report the abuse allegations. Instead, he replied, "I think some people would say that if you behaved, then the mistreatment would stop. I suggest you go talk to your mom, see if she will go on a walk with you." Motion Response, ECF No. 26, PageID.244; ECF No. 26-2, PageID.266-67. She also says that the defendants "had [Selena] safely in custody and confined securely" in Mollett's office but later sent her home and "concealed information" by failing to inform authorities that Selena was suicidal, under the influence of drugs, or had been mistreated at home. ECF 26, PageID.247. These specific factual allegations are not included in the plaintiff's complaint. And although Renick alleges in her complaint that Selena exchanged emails regularly with defendant Mollett, Compl. ¶ 19, ECF No.1, PageID.5, she did not attach the emails to her complaint; instead, she introduced them for the first time in her motion response.

Renick, as personal representative of Selena's estate, brought this lawsuit in August 2023, naming as defendants Annapolis High School, Dearborn Heights School District No. 7, Weeks, and Mollett. She asserts state law wrongful death and gross negligence claims (Counts I and II), as well as federal claims under 42 U.S.C. § 1983 under a state-created danger theory (Counts III and IV). The defendants filed their motion for judgment on the pleadings in July 2024, and the

case was reassigned to the undersigned the following month.  Shortly thereafter, the plaintiff filed a motion to dismiss her state law claims without prejudice.

II.

The defendants appropriately brought their motion under Federal Rule of Civil Procedure 12(c) since they have answered the complaint and the pleadings are closed.  A motion under that rule invokes the same standards that govern motions to dismiss filed under Rule 12(b)(6).  *See* Fed. R. Civ. P. 12(c); *Vickers v. Fairfield Med. Ctr.*, 453 F.3d 757, 761 (6th Cir. 2006); *Ziegler v. IBP Hog Mkt., Inc.*, 249 F.3d 509, 511-12 (6th Cir. 2001).  When evaluating a motion under Rule 12(b)(6), the Court is called upon to determine if the "complaint . . . contain[s] sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'"  *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (quoting *Bell Atlantic Corp. v. Twombly*, 550 U.S. 544, 547 (2007)).  A "claim is facially plausible when a plaintiff 'pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged.'"  *Matthew N. Fulton, DDS, P.C. v. Enclarity, Inc.*, 907 F.3d 948, 951-52 (6th Cir. 2018) (quoting *Iqbal*, 556 U.S. at 678).  When reviewing the motion, the Court "must construe the complaint in the light most favorable to the plaintiff and accept all [factual] allegations as true."  *Donovan v. FirstCredit, Inc.*, 983 F.3d 246, 252 (6th Cir. 2020) (quoting *Keys v. Humana, Inc.*, 684 F.3d 605, 608 (6th Cir. 2012)).

When deciding a motion under Rule 12(b)(6) or Rule 12(c), the Court looks only to the pleadings, *Jones v. City of Cincinnati*, 521 F.3d 555, 562 (6th Cir. 2008), the documents attached to them, *Commercial Money Ctr., Inc. v. Illinois Union Ins. Co.*, 508 F.3d 327, 335 (6th Cir. 2007) (citing Fed. R. Civ. P. 10(c)), documents referenced in the pleadings that are "integral to the claims," *id.* at 335-36, documents that are not mentioned specifically but which govern the

plaintiff's rights and are necessarily incorporated by reference, *Weiner v. Klais & Co., Inc.*, 108 F.3d 86, 89 (6th Cir. 1997), *abrogated on other grounds by Swierkiewicz v. Sorema, N.A.*, 534 U.S. 506 (2002), and matters of public record, *Northville Downs v. Granholm*, 622 F.3d 579, 586 (6th Cir. 2010).   However, before a court considers documents "integral to the claims" and that are referenced in the complaint, "it must also be clear that there exists no material disputed issues of fact regarding the relevance of the documents." *Diei v. Boyd*, 116 F.4th 637, 644 (6th Cir. 2024) (*Ouwinga v. Benistar 419 Plan Servs., Inc.*, 694 F.3d 783, 797 (6th Cir. 2012)).   If those extra-complaint materials are to be considered, the Court must convert the motion to a motion for summary judgment under Rule 56 and allow all parties to present evidence, which usually means that an opportunity to conduct discovery should be given. *Id.* at 643 (citing Fed. R. Civ. P. 12(d)).

A.

The defendants argue in their motion that the plaintiff has not alleged facts sufficient to plead a due process claim based on a state created danger theory.   They assert that Renick has not alleged that the defendants committed any affirmative act that caused Selena to take her own life, much less one that created or greatly increased the risk that she would commit suicide, and she has failed to allege any behavior on the part of school employees that would shock the conscience or put them on notice of a specific risk of harm.   The defendants cite Sixth Circuit precedent that, they believe, forecloses claims of this type arising from suicide.   They also assert that the individual defendants are entitled to qualified immunity.

Renick responds that the defendants placed Selena in a greater state of peril by sending her home after school on the day she committed suicide when they knew or should have known that she was emotionally unstable.   Renick relies on the email exchange with Mollett, which is nowhere to be found in the pleadings, but also points to allegations in the complaint that the defendants

were aware of the risk of harm to the plaintiff in her household, the fact that she was using marijuana at school, the signs of self-harm on her body, and that they failed to take action.  The Fourteenth Amendment prohibits state actors from "depriv[ing] any person of life, liberty, or property, without due process of law."  U.S. Const. Amend. XIV, § 1.  "But nothing in the language of the Due Process Clause itself requires the State *to protect* the life, liberty, and property of its citizens against invasion by private actors."  *DeShaney v. Winnebago Cnty. Dep't of Soc. Servs.*, 489 U.S. 189, 195 (1989) (emphasis added).  It is settled law that "a State's failure to protect an individual against private violence simply does not constitute a violation of the Due Process Clause.'"  *Id.* at 197.

An exception to that general rule emerges when the state takes action to increase the risk to certain individuals consigned to its care by rendering them more vulnerable to harm.  *Id.* at 198. When evaluating claims under this theory, one must start with *DeShaney*.  In that case, county social workers had received complaints that a young child was being abused by his father, with whom he lived.  The father denied the accusations when the social workers interviewed him.  But less than a year later, the child was seen in a hospital emergency department "with multiple bruises and abrasions." 489 U.S. at 192.  The doctor, suspecting child abuse, immediately obtained a court order allowing the hospital to take temporary custody of the child.  But three days later, county officials determined that there was insufficient evidence of child abuse and returned him to his father.  A month later, the boy was again seen in the emergency room with serious injuries, but "[t]he caseworker concluded that there was no basis for action."  *Ibid.*  The caseworker entertained suspicions that the boy was being abused, having seen head injuries at various times during her monthly home visits.  But she did nothing except make a record of her findings.  *Id.* at 192-93. Four months later, the hospital notified the department of social services that the child was seen in

the emergency room again with injuries likely caused by child abuse.  The department still took

no action.  Then, four months after that, the child's father beat him so severely that the boy suffered

permanent and profound brain damage.  *Id.* at 193.  The child's mother brought an action for

herself and her son against the county officials alleging that they deprived the child of his rights

under the Due Process Clause "by failing to intervene to protect him against a risk of violence at

his father's hands of which they knew or should have known." *Id.* at 193.  The case was dismissed,

and the Supreme Court affirmed the dismissal.  The Court reiterated the general proposition that

the Fourteenth Amendment creates no affirmative duty of protection on the part of state actors,

unless a "special relationship" exists, such as when a state takes someone into custody and is

obliged therefore to furnish adequate subsistence and medical care.  *Id.* at 197-99.  As for the child

in that case, despite having taken him into temporary custody and then returning him to the custody

of his abuser, "it placed him in no worse position than that in which he would have been had it not

acted at all." *Id.* at 201.  The Court declared that "the State does not become the permanent

guarantor of an individual's safety by having once offered him shelter." *Ibid.*

The state created danger theory of substantive due process has developed in this circuit,

initially in the context of persons taken into custody.  In a case involving a school and students,

the court of appeals held that to succeed under this theory, a plaintiff "must show three things."

*M.J. ex rel. S.J. v. Akron City Sch. Dist. Bd. of Educ.*, 1 F.4th 436, 448 (6th Cir. 2021).  "First, they

must show 'an affirmative act by the state which either created or increased the risk that [they]

would be exposed to an act of violence by a third party.'"  *Id.* at 448-49 (quoting *Cartwright v.

City of Marine City*, 336 F.3d 487, 493 (6th Cir. 2003)).  "Next, they must establish 'a special

danger to [them] wherein the state's actions placed [them] specifically at risk, as distinguished

from a risk that affects the public at large.'"  *Ibid.*  "And finally, they must show that the state was

aware of the 'substantial risk of serious harm' and responded in a way that was 'conscience shocking.'" *Ibid.* (quoting *Doe v. Jackson Local Sch. Bd. of Educ.*, 954 F.3d 925, 934 (6th Cir. 2020)). The third element of that formula "requires a showing of at least deliberate indifference. And '[t]he government's conduct must be so egregious that it can be said to be arbitrary in the constitutional sense.'" *Id.* at 449-50 (quoting *McQueen v. Beecher Cmty. Schs.*, 433 F.3d 460, 469 (6th Cir. 2006)).

The defendants focus their argument on the first and third elements. They also argue that the Sixth Circuit has held categorically that claims alleging a state-created danger based on a student's decision to commit suicide outside of school cannot proceed.

On the latter point, it is true that the Sixth Circuit has characterized its precedents as "treat[ing] suicide differently" and has "not yet extended the state-created-danger exception to [] instances of suicide by someone not in official custody." *Wilson v. Gregory*, 3 F.4th 844, 859 (6th Cir. 2021). The court has explained that the inapplicability of that theory is partially attributable to the legal reality that generally "people cannot violate their own constitutional rights, [so] where a person makes a free and affirmative choice to end his life, the responsibility for his actions remains with him." *Cutlip v. City of Toledo*, 488 F. App'x 107, 116 (6th Cir. 2012). "That a state official somehow contributed to a person's decision to commit suicide does not transform the victim into the state's agent of his own destruction." *Ibid.* However, the court of appeals made these statements when evaluating whether qualified immunity shielded a defendant from liability, so they do not necessarily define the scope of the right. The court also acknowledged that other courts have "seriously entertained liability" in cases "involv[ing] the suicide of minors where school officials or police were in some way responsible." *Id.* at 115 (citing *Armijo v. Wagon Mound Pub. Schs.,* 159 F.3d 1253, 1262–64 (10th Cir. 1998). Nonetheless, no published Sixth

Circuit precedent holds as much, which is an important consideration when deciding whether the right allegedly violated was clearly established at the time and therefore whether qualified immunity applies. *See Cunningham v. Shelby Cnty., Tennessee*, 994 F.3d 761, 764 (6th Cir. 2021) (citing *Ashcroft v. al-Kidd*, 563 U.S. 731, 735 (2011)).

The state created danger theory of substantive due process has developed in this circuit, with *Wilson v. Gregory* being the latest word. The plaintiff in that case did not prevail, mainly because the court found that the right was not clearly established and therefore the defendants were entitled to qualified immunity. 3 F.4th at 859. But the court did not explicitly rule out the application of that theory in suicide cases. At this stage of the present matter, we must look at the pleaded facts and the three elements of the claim identified by the court of appeals.

1. Affirmative Act

The plaintiff cites the following facts pleaded in the complaint as "affirmative acts" that created or increased the risk of Selena's suicide: 1) failing to follow school policies involving students under the influence of intoxicating substances, 2) not reporting to her mother that Selena had been using marijuana, and 3) allowing Selena to leave the school office and go home on the day she took her life. Compl. ¶¶ 22-23, ECF No. 1, PageID.6. In her response brief, the plaintiff adds the unpleaded allegations that Mollett sent an email to Selena in response to a message from her where she informed him about unsafe living conditions in her home, two days before her death, suggesting that she change her own behavior and take a walk with her mother to discuss things; and Mollett's subsequent failure to report the suspected abuse, allegedly in violation of Michigan law.

This set of allegations falls short of stating affirmative conduct by defendant Mollett tied to Selena's suicide. The type of conduct required by the state created danger theory is "an *affirmative* act"; "failure to act is not an affirmative act under the state-created danger theory."

*Wilson*, 3 F.4th at 858 (emphasis added) (quoting *Cartwright v. City of Marine City*, 336 F.3d 487, 493 (6th Cir. 2003)). At most, the plaintiff has alleged a variety of *non*-actions, which even if true, do not implicate legal liability. And as the defendants point out, the Sixth Circuit has held that reframing a party's omission to perform a legally obligated duty, such as a duty to report child abuse, is not an affirmative act that would give rise to a state-created danger claim. *Engler v. Arnold*, 862 F.3d 571, 576 (6th Cir. 2017) ("A state official's failure to investigate or report allegations of child abuse does not constitute an affirmative act." (citing *Langdon v. Skelding*, 524 F. App'x 172, 176 (6th Cir. 2013))).

The plaintiff argues that *M.S. by Covington v. Hamilton County Department of Education*, 756 F. App'x 510 (6th Cir. 2018), supports a different result. In that case, a school district contracted with a company to provide bus transportation for the district. *Id.* at 511. The district received multiple warnings that one of the company's drivers drove dangerously but did nothing to intervene; instead, the elementary school principal repeatedly instructed students to board the bus driven by the dangerous driver. *Id.* at 512. The driver later crashed the bus, killing six students and injuring several others. *Ibid.* The court of appeals rejected the district's contention that the principal only was following school policy and that his actions therefore amounted to an "act of *omission*— failing to deviate from the District's policy," observing that policy or no policy, the principal still took some action. *Id.* at 516. But that case plainly is distinguishable from the present circumstances. There, the school principal was giving "directives" and "assisting students onto a bus that she knew was dangerous," which are affirmative acts. *Ibid.* In contrast, the plaintiff here alleges no action on Mollett's part leading to increased danger, only a series of actions he likely *should* have taken. The plaintiff contends that the cases are comparable because Mollett sent Selena home alone to a place where she felt abused. This attempt to reframe a non-action as

an action is inconsistent with how the events are characterized in the plaintiff's complaint.  *See*
Compl. ¶ 23 ("MOLLETT *allowed* SELENA to leave school premises . . . .") (emphasis added).

Even considering the factual allegations added in the response brief, no affirmative acts
properly are set forth.  As framed in her brief, Mollett supposedly allowed Selena to return home
alone from a "status quo of safety" in the principal's office "in the school's custody and under its
direct supervision."   His response to Selena's plaintiff email expressing concerns about
mistreatment at home was that she consider taking "a walk" with her mother in response to an
email.  Even if affirmative conduct could be inferred from these arguments, the "key question . . .
is 'not whether the victim was safer during the state action, but whether [s]he was safer before the
state action than [s]he was after it.'"  *Wilson*, 3 F.4th at 858 (quoting *Cartwright*, 336 F.3d at 493).
Accepting the plaintiff's allegations as true, Selena already was struggling with suicidal ideation
and intoxicated from marijuana use before the defendants encountered her; none of the plaintiff's
allegations suggest that Mollett's response changed the course or trajectory of Selena's behavior
to increase her risk of suicide.  *See Cartwright*, 336 F.3d at 493 (reversing denial of motion for
summary judgment on state created danger theory where police transported a man from the side
of a highway to a convenience store where he was later hit by a truck on the ground that the police
placed him in a position of lesser danger, concluding that the relevant question is "whether he was
safer *before* the state action than he was *after* it.");  *DeShaney*, 489 U.S. at 192 (affirming denial
of summary judgment to a minor plaintiff who was placed in temporary state custody due to
suspected abuse by his father but later returned to his father's care, where he was badly beaten and
suffered life threatening injuries); *Jones v. Reynolds*, 438 F.3d 685, 688-89, 691-92 (6th Cir. 2006)
(affirming grant of summary judgment to police officers who told participants in a fatal drag race
that they could "go ahead with the race" because there was no evidence that this action increased

the risk to the participants or spectators); *Koulta v. Merciez*, 477 F.3d 442, 446 (6th Cir. 2007) (reversing denial of qualified immunity to officers who encountered a drunk driver and let her go before she later was involved in a fatal crash because the officer's actions "did not 'create' or 'increase' the danger" of her drinking and driving).

In the same vein, it is not reasonable to infer that Mollett's suggestion that Selena take a walk with her mother greatly increased the risk of her suicide. In full, Mollett's quote in the emails is "I think some people would say that if you behaved then the mistreatment would stop. I suggest you go talk to your mom, see if she will go on a walk with you." ECF No. 26-2, PageID.266. This advice occurred as part of a series of emails where Selena generally described troubles at home. After Mollett rendered his advice, Selena responded again asking for additional help. *Ibid.* Mollett then asked her what her desired outcome would be. *Ibid.* No further emails are produced in the record.

The plaintiff's argument in her motion response regarding Mollett's alleged decision to send Selena home while she was intoxicated and with knowledge of her past thoughts of suicide also do not accurately portray the record. Nowhere is it alleged that Selena expressed an intention or desire to kill herself. The plaintiff does allege that Selena had exhibited "physical signs of self-induced trauma to her extremities," and that the "defendants" "could have . . . linked [that behavior] to her suicidal ideation." Compl. ¶ 18, ECF No. 1, PageID.5. But there are no facts alleged that such "ideation" was even articulated. And even in the email exchanges that are not part of the pleadings, Selena never alludes to suicide or a desire to end her life. Case law instructs that courts must focus on the state of affairs that existed before the government intervention, not the state of temporary safety. *See Cartwright*, 336 F.3d at 493; *see also Franz v. Oxford Cmty. Sch. Dist.*, No. 21-12871, 2023 WL 3431223, at *6 n. 8 (E.D. Mich. May 12, 2023) (Goldsmith,

J.) (collecting cases). From this perspective, the plaintiff has alleged no facts suggesting that Mollett's decision to allow Selena to go home magnified or otherwise increased troubles that she already experienced.

The plaintiff has not alleged facts showing that defendant Mollett committed an affirmative act that created or increased the risk of Selena's suicide.

This deficiency is even more pronounced for defendant Weeks. He was the district's superintendent. The plaintiff has not alleged that he had any interaction with Selena or participated in the events leading to Selena's death. It is well established that "[u]nder § 1983, there is no *respondeat superior* or vicarious liability." *Flagg v. City of Detroit*, 715 F.3d 165, 174 (6th Cir. 2013) (quoting *Collins v. City of Harker Heights*, 503 U.S. 115, 122 (1992)). To state a claim against Weeks for constitutional violations under section 1983, the plaintiff must demonstrate that he "'directly participated' in the alleged misconduct, at least by encouraging, implicitly authorizing, approving or knowingly acquiescing in the misconduct, if not carrying it out himself." *Ibid.* (citing *Shehee v. Luttrell*, 199 F.3d 295, 300 (6th Cir. 1999)).

The plaintiff has not pleaded facts sufficient to make that showing here. The amended complaint is devoid of allegations that Weeks was involved in any way with the events leading up to Selena's death; the only allegation of conduct specific to him is that he and Mollett appeared at Selena's residence after her death to discuss it with her family. This allegation says nothing about how he acted to create a danger to her life. The plaintiff has failed to plead a claim against Weeks.

### 2. Special Danger

The parties' arguments do not address this factor in depth in their pleadings. And, in any event, the plaintiff's pleadings clearly articulate a concern regarding the defendants' actions vis-à-vis Selena, not the world at large, so there is sufficient material to state a claim on this element.

### 3. Defendants' Awareness and Response

The plaintiff also must plead facts demonstrating that when defendants committed an affirmative act that increased the peril of suicide to Selena, they acted culpably as to "shock[] the conscience." *Ewolski v. City of Brunswick*, 287 F.3d 492, 510 (6th Cir. 2002). This element requires a plaintiff to demonstrate at least deliberate indifference on the part of the defendants. *Jane Doe v. Jackson Loc. Sch. Dist. Bd. of Educ.*, 954 F.3d 925, 933 (6th Cir. 2020). This component has two parts. First, "[a]n official must 'be aware of facts from which the inference could be drawn that a substantial risk of serious harm exists, and he must also draw the inference.'" *Ibid.* (quoting *Ewolski*, 287 F.3d at 510). Second, "[h]aving drawn the inference, the official next must act or fail to act in a manner demonstrating reckless or callous indifference toward the individual's rights." *Ibid.* (cleaned up). The plaintiff's allegations must establish that the defendant "knew both the 'scope and substance' of the particular risk of harm at issue." *Kechen v. Univ. of Michigan*, 100 F.4th 751, 764 (6th Cir. 2024) (quoting *Range v. Douglas*, 763 F.3d 573, 591 (6th Cir. 2014)).

As discussed above, the plaintiff has not alleged facts to suggest that the defendants had knowledge that Selena intended to commit suicide that day. The reference in the complaint to "suicidal ideation" is not tied to any fact indicating that such an idea was ever expressed. Moreover, even if the defendants were aware of a risk of self-harm, such as cutting, provoked by emotional instability, their action taken in response (according to the complaint) — letting Selena leave the school at the end of the day — does not amount to conscience-shocking behavior. Certainly, allowing a student to return to home where there was no evidence of past physical abuse pales against the facts of *DeShaney*, where the young child was returned to his father, who be all accounts had repeatedly beat him.

And consider the plaintiff's allegations in comparison to the more recent cases of *McQueen v. Beecher Community Schools*, 433 F.3d 460, 466 (6th Cir. 2006), and *Jane Doe v. Jackson Local School District*.  In *McQueen*, a teacher left her elementary students unsupervised for several minutes; during this period, one of the students fatally shot another student.  *McQueen*, 433 F.3d at 462-63.  The teacher had notice that the student previously had attacked students and had stabbed them with a pencil.  *Ibid.*  The Sixth Circuit held that the student's history of behavioral problems did not create a fact dispute as to the teacher's culpability because there was no obvious risk that his behavior would escalate to a shooting, and the plaintiff had made no showing that the teacher knew or suspected that the student had a dangerous weapon in his possession.  *Id.* at 470.  The court in *Doe*, another disturbing case, reasoned similarly.  There, a fifth grader sexually abused a kindergartner on a school bus.  *Doe*, 954 F.3d at 935.  The court of appeals affirmed the district court's grant of summary judgment to the defendants, holding that nothing about the older student's past behavioral problems would warn the school employees that he might sexually assault other students and that their response to earlier behavioral problems — creating a "safety plan" and moving the student to the front of the bus — did not demonstrate a callous disregard or otherwise conscience-shocking behavior.  *Id.* at 935-36.

The plaintiff responds that she has sufficiently alleged conscience-shocking behavior in Mollett's failure to report his knowledge of Selena's suicidal ideation and his decision to send her home at the end of the school day, aware she was under the influence of marijuana.  But it bears repeating that there are no allegations of prior expressions of suicidality or that Selena ever voiced any such thoughts.  Sending home a student who had been using marijuana — even one who had complained of the way her mother and stepfather had been treating her — does not amount to conscience-shocking behavior.  It likely does not even arise to deliberate indifference, since home

is the place where students return at the end of the school day.  There is no hint in the pleadings that Selena's home life was a source of danger or peril.  Again, *compare DeShaney*, 489 U.S. at 192-93.  The complaint does not set forth sufficient facts to establish the third element of a state-created danger claim.

B.

Even if the plaintiff could state a claim under 42 U.S.C. § 1983 and the Fourteenth Amendment in her complaint, qualified immunity poses another barrier.  The plaintiff must allege both a violation of a constitutional right *and* that the right was clearly established.  *Cunningham*, 994 F.3d at 764.  Although it is generally the case that qualified immunity should be decided based on the factual record developed during discovery, the validity of the defense "may be apparent from the face of the complaint, rendering a motion to dismiss appropriate."  *Crawford v. Tilley*, 15 F.4th 752, 763 (6th Cir. 2021).

Even if the plaintiff were able make out a constitutional violation, the right at issue was far from clearly established in this circuit.  As discussed above, the Sixth Circuit repeatedly has expressed doubt that a state-created danger claim has *any* applicability in the context of a suicide. *See Wilson*, 3 F.4th at 859; *Cutlip*, 488 F. App'x at 116; *see also Jahn v. Farnsworth*, 617 F. App'x 453, 463 (6th Cir. 2015).  And in *Wilson*, the court of appeals held that with this legal backdrop, the defendants were entitled to qualified immunity.  *See Wilson*, 3 F.4th at 859 ("If the salient question in determining if a defendant is entitled to qualified immunity is whether she had fair warning that her conduct was unconstitutional, then we cannot say that Deputies Gregory and Walsh had sufficient warning of the possible unconstitutionality of their conduct." (cleaned up and citations omitted)).

- 16 -

The plaintiff has cited no cases since *Wilson* that would disturb this conclusion.  Instead, she directs the Court to *Armijo v. Wagon Mound Pub. Schools*, 159 F.3d 1253 (10th Cir. 1998), where the Tenth Circuit denied summary judgment to certain educators on a state-created danger claim who, knowing the student was suicidal and had access to firearms, sent the student home without notifying his parents.  *Id.* at 1264.  Even if that case were on all fours with the present allegations, the fact remains that out-of-circuit case law generally is not useful for determining whether the right at issue was clearly established.  *See Ashford v. Raby*, 951 F.3d 798, 804 (6th Cir. 2020).  And the only exception — where out-of-circuit decisions point "unmistakably" to a holding as to "leave no doubt" — is inapplicable here, especially in light of circuit decisions rejecting such claims in the context of noncustodial adolescent suicides.  *See Wilson*, 3 F.4th at 858 (collecting cases).  Further factual development will not alter the reality that no Sixth Circuit or Supreme Court case put the defendants on notice that their conduct, as alleged in the complaint, was unconstitutional.

### C.

The plaintiff also alleges that the School District is responsible for the individual defendants' conduct.  To prevail on her section 1983 claims against the School District, Renick must show that (1) she suffered a constitutional violation and (2) either a *custom* of toleration for illegal practices or the *ratification* of a violation by an official with final decision-making authority directly caused her deprivation.  *Monell v. Dep't of Soc. Servs.*, 436 U.S. 658, 691, 694 (1978) (holding that "a municipality cannot be held liable under § 1983 on a *respondeat superior* theory"); *Pembaur v. City of Cincinnati*, 475 U.S. 469, 483 (1986) (holding that a plaintiff can demonstrate an official policy by pointing to a decision of an official with final decision-making authority over the matter at issue).  She may show the existence of "an illegal policy or custom by demonstrating one of the following: (1) the existence of an illegal official policy or legislative enactment; (2) that

an official with final decision-making authority ratified the illegal actions; (3) the existence of a policy of inadequate training or supervision; or (4) the existence of a custom of tolerance or acquiescence of federal rights violations." *Burgess v. Fischer*, 735 F.3d 462, 478 (6th Cir. 2013).

In her complaint, the plaintiff pleads several potential unlawful policies: she says the defendants had a policy of concealing "suspected or known risks of SELENA's suicide risk and Marijuana intoxication," a policy of refusing to prevent a student known to present a risk of self-harm from leaving campus, a failure to train staff how to handle students known to be suicidal, a policy of disregarding student mental health crises, and a policy of declining to file mandatory reports of abuse or negligence as required by state law.  Compl. ¶ 79, ECF No. 1, PageID.20-21. However, these allegations do not establish a claim against the School District because they amount to little more than assertions that the School District had a policy of failing to act, which is not unconstitutional.  *See Nelson-Molnar v. Ann Arbor Pub. Sch.*, No. 23-11810, 2024 WL 2059709, at *7 (E.D. Mich. May 8, 2024) ("[W]hile plaintiffs also allege policies of inadequate training and declining to file mandatory reports of suspected child abuse, those alleged policies are not relevant to the analysis because they did not enable the affirmative act that forms the unconstitutional activity in this case.").  And to assert a claim based on a custom of "inaction" in the face of unconstitutional conduct, the plaintiff must allege:

> (1) "a clear and persistent" pattern of unconstitutional conduct by [the defendant's] employees; (2) the [defendant's] "notice or constructive notice" of the unconstitutional conduct; (3) the [defendant's] "tacit approval of the unconstitutional conduct, such that [its] deliberate indifference in [its] failure to act can be said to amount to an official policy of inaction"; and (4) that the policy of inaction was the "moving force" of the constitutional deprivation, such that the plaintiff's constitutional injury was directly caused by the conduct of the [defendant] rather than simply by the conduct of the [defendant's] employee.

*D'Ambrosio v. Marino*, 747 F.3d 378, 387-88 (6th Cir. 2014) (quoting *Doe v. Claiborne Cnty.*, 103 F.3d 495, 508 (6th Cir. 1996)).

Against this standard, the plaintiff's allegations fall short. Most prominently, she does not allege a clear and persistent practice of unconstitutional conduct. Instead, the allegations stem from the single incident leading to Selena's death. This is problematic because "[t]here is an analytical distinction between being deliberately indifferent as to one particular incident, and having a 'policy' of always being deliberately indifferent to unconstitutional actions." *Claiborne Cnty.*, 103 F.3d at 508. To the extent the allegations can be read to suggest a pattern, they do so in a conclusory manner and include no suggestion of other similar instances of wrongful conduct. True, the plaintiff alleges that Mollett "routinely failed to enforce" the School District's code of conduct to maintain his popularity among students, Compl. ¶ 31, ECF No. 1, PageID8, but even if this practice were considered to be a constitutional violation, the plaintiff has not alleged that district leadership had notice of this failure or, in any sense, gave its approval to the practice. It also is difficult to see how enforcing a disciplinary policy would have helped Selena in her final days.

Moreover, to hold a municipality liable under *Monell*, the plaintiff must sufficiently plead an underlying constitutional violation. *See Blackmore v. Kalamazoo Cnty.*, 390 F.3d 890, 900 (6th Cir. 2004) ("A municipality or county cannot be liable under § 1983 absent an underlying constitutional violation by its officers."). The plaintiff's failure to state a claim against the individual defendants forecloses a claim against the municipal entity. The plaintiff's allegations are insufficient state a claim against the district, and it is entitled to judgment on the pleadings.

### D.

The plaintiff also has filed a motion to dismiss her state law claims without prejudice. The defendant opposes the motion, arguing that Federal Rule of Civil Procedure 41(a) only permits the

dismissal of actions, not subsets of claims, and that the state law claims should be dismissed with prejudice on the merits.

The Court declines to address these arguments. Federal courts have supplemental jurisdiction over state claims if they are "so related to" the federal claims over which the court has original jurisdiction "that they form part of the same case or controversy." 28 U.S.C. § 1367(a). For purposes of this action, the Court has jurisdiction under 28 U.S.C. § 1331 over the plaintiff's section 1983 claims. Her state claims under Michigan law are related to the federal claims because they arise from the same factual circumstances. Nonetheless, section 1367(c) confers discretion upon district courts to decline supplemental jurisdiction over state claims if it "has dismissed all claims over which it has original jurisdiction[.]" 28 U.S.C. § 1367(c)(3). In exercising this discretion, courts are to consider several factors, including whether declining jurisdiction would lead to wasteful proceedings due to the overlap between state and federal law, whether it would cause unfairness to a party, whether it would undermine federal-state comity, and whether a party has manipulated the case to reach the federal forum. *See Gamel v. City of Cincinnati*, 625 F.3d 949, 951-52 (6th Cir. 2010).

Here, all of the plaintiff's federal claims will be dismissed on the merits. The Sixth Circuit has stated repeatedly that "[i]f the federal claims are dismissed before trial, the state claims generally should be dismissed as well." *Brooks v. Rothe*, 577 F.3d 701, 709 (6th Cir. 2009) (citations omitted). A dismissal of federal claims under Rule 12(b)(6) creates a "strong presumption" in favor of dismissal of state law claims, which may be overcome only in "unusual circumstances." *Musson Theatrical, Inc. v. Fed. Exp. Corp.*, 89 F.3d 1244, 1255 (6th Cir. 1996). No such circumstances are present here. The state law claims will be dismissed without prejudice.

III.

The complaint in this case describes a tragic loss of the life of a young woman.  However, even if the plaintiff had pleaded a constitutional violation on the part of the defendants, which she has not, the individual defendants would be entitled to qualified immunity, and she has pleaded no facts sufficient to support a claim for municipal liability.

Accordingly, it is **ORDERED** that the defendants' motion for judgment on the pleadings (ECF No. 15) is **GRANTED IN PART**.

It is further **ORDERED** that Counts III and IV of the complaint based on federal law are **DISMISSED WITH PREJUDICE**, and Counts I and II of the complaint based on state law are **DISMISSED WITHOUT PREJUDICE**.

It is further **ORDERED** that the plaintiff's motion to voluntarily dismiss her state law claims (ECF No. 32) is **DISMISSED as moot**.

It is further **ORDERED** that the motion to compel discovery (ECF No. 13) is **DISMISSED as moot**.

s/David M. Lawson
DAVID M. LAWSON
United States District Judge

Dated:   January 16, 2025

- 21 -